475 S.E.2d 176

STATE of West Virginia ex rel., Patricia BONER, individually and as the Mother and next friend of her Son; Twylla Bays, individually and as the Mother and next friend of her Daughter; Sarah McGuire, Georgette Connelly, Dewey Lester, Judith McHugh and Betty Palmer, Public, Full–Time Homebound Teachers in Kanawha County; and James Hale, a Public School Psychologist for the Kanawha County Board of Education, Petitioners,

v.

The KANAWHA COUNTY BOARD OF EDUCATION; Jorea Marple, Superintendent, Kanawha County Schools; The West Virginia Board of Education; and Henry R. Marockie, State Superintendent of Schools, Respondents.

No. 22365.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 1996.

Decided July 19, 1996.

---

Larry Harless, Cockeysville, Maryland., for Petitioners.

Gregory W. Bailey, General Counsel, Charleston, for Respondents Kanawha County Board of Education and Jorea Marple.

John S. Dalporto, Assistant Attorney General, Charleston, for Respondents West Virginia Board of Education and State Superintendent of Schools.

Howard E. Seufer, Jr., Bowles Rice McDavid Graff & Love, Charleston, for West Virginia Association of School Administrators and Boards of Education of Harrison, Jackson, Marion, Mineral, Raleigh, Roane, Tucker, Wayne and Wetzel Counties as Amici Curiae.

William B. McGinley, General Counsel; George P. Surmaitis, Crandall, Pyles & Haviland, Charleston, for West Virginia Education Association as Amicus Curiae.

Mike Kelly, Kelly & Grubb, Charleston, for West Virginia Advocates and West Virginia Federation of Teachers as Amicus Curiae.

WORKMAN, Justice:

Petitioners [1] seek a writ of mandamus directing the Respondent State Superintendent of Schools, Henry Marockie, to refrain from abolishing the positions of seven Kanawha County full-time public school teachers who provide home/hospital (also referred to as "homebound") instruction and one public school psychologist. After examining this issue, we determine that the plan to reduce previously full-time positions to hourly positions with no concomitant showing of any reduction in need for such instruction is not consistent with the statutory scheme encompassed within West Virginia Code §§ 18A–1–1 to –4–18 (1993 & Supp.1995), that requires

contractual employment of teachers and attendant benefits. Accordingly, we grant the requested writ of mandamus.

**I.**

On June 23, 1994, Petitioners instituted this original proceeding against the Respondents [2] seeking to forestall the implementation of the Kanawha County Board of Education's (the "Board") plan to cease employing teachers on a full-time contractual basis for the provision of homebound instruction.[3] In the place of the seven full-time teachers that the Board had previously employed for such instruction, the Board planned to hire individuals on an hourly-pay basis.[4] The Board acknowledges that its sole motivation in enacting this plan was to save money. *See infra* note 10.

We appointed Kanawha County Circuit Court Judge Irene C. Berger as Special Master [5] for the purpose of taking evidence and preparing a report on certain issues [6] set

1. The Petitioners in this case include: (1) Patricia Boner, a Kanawha County mother of a child with cystic fibrosis; (2) Twylla Bays, a Kanawha County mother of a child with degenerative muscular disease and respiratory problems; (3) Sarah McGuire, Georgette Connelly, Dewey Lester, Judith McHugh, and Betty Palmer, Kanawha County full-time homebound teachers; and (4) James Hale, a public school psychologist.

2. In addition to the Superintendent of Schools, Petitioners have named the following as Respondents: (1) the Kanawha County Board of Education; (2) Jorea Marple, as the Kanawha County Superintendent of Schools; and (3) the West Virginia Board of Education.

3. According to Kanawha County guidelines, "[t]he home/hospital instructional program provides temporary or long term education services to students who are unable to attend school because of injury, temporary or chronic health problems or other reasons." Additionally, section 1.10 of West Virginia Department of Education Policy 2419: Regulations for the Education of Exceptional Students ("Policy 2419"), provides that "[s]tudents who receive home/hospital instruction are students who, due to injury or for any other reason as certified by a licensed physician, are homebound for a period of three weeks or more."

4. In addition to altering the manner of employment, the Board's plan shifted the supervision and coordination of the homebound instruction program from a central administrator to six area

assistant superintendents. The Special Master's report indicates that this particular change has already been implemented. While Petitioners did not seek relief along these lines in their petition, as part of their brief, they requested this Court to direct "[t]hat a centralized office, or headquarters, whose occupancy and uses are devoted to home-school teachers ... be established and maintained to coordinate and control home-school and related activities, with at least one school employee to serve as a paid, overall coordinator or manager." We do not address this issue, as we find no merit to it.

5. *See* W.Va.S.Ct.R.A.P. 14(e).

6. The following issues were identified by this Court as the focus of the Special Master's report:

(1) all rules and regulations which relate to the teaching of homebound children pursuant to West Virginia Code § 18–20–1, et seq., or the federal act;

(2) a description of the homebound program in Kanawha County before the recent change by the Board, including: (a) the teachers involved, their specialties and contract arrangement with the Board and the individual children; (b) the number of students involved and the division between the truly handicapped and those temporarily and/or long-term homebound due to illness and/or accident; (c) whether a teacher assigned to the handicapped was assigned for a particular period of time, and if so, how long;

forth in this Court's order, dated September 22, 1994. After taking evidence on May 22, and June 5, 1995, Special Master Berger issued a report on August 7, 1995. The fourteen-page report was prepared as "an objective representation of the issues" and "[a]s such, no recommendations, final conclusions or opinions regarding the [Kanawha] County's home/hospital instructional program ... [were] made...."

Included in the findings of the Special Master was a description of the homebound instruction program.[7] During the 1993–94 school year, there were 449 homebound students in Kanawha County. Of the seven budgeted positions for full-time homebound teachers for the 1993–94 school year, three of the positions were vacant due to retirements that occurred in the Spring of 1994. In addition to these full-time instructors, Kanawha County schools employed a number of teachers to provide homebound instruction from a list of substitutes who were paid on an hourly basis for their services.[8] Whereas the full-time homebound teachers received the same benefits as other full-time teachers, such as health insurance, holidays, and paid instructional days, the hourly-paid instructors did not receive such benefits.

During the 1993–94 school year, $216,435.50 was expended by Kanawha County for both full-time and part-time homebound instruction. Based on declining enrollment and other budgetary factors, a decision was reached in the Spring of 1994 to eliminate all regular full-time teachers who provided homebound instruction.[9] Despite a decision to increase the hourly rate of compensation for part-time homebound instructors from $9 per hour to $15 per hour, it was projected that Kanawha County would realize a savings of $72,585 [10] by instituting this employment change.

Petitioners argued in their petition and initial briefs that the Board should be prohibited from "contracting out" for the services previously provided by seven full-time homebound teachers on the following grounds: (1) "contracting out," by its discontinuity, instability, and other negative features would be seriously detrimental to the well-being, education, and development of numerous homebound children; (2) the state's mandated public educational system bars Respondents from effecting this "contracting out" arrangement; and (3) the "contracting out" scheme violates the equal protection and substantive due process rights of the homebound students, their parents, and their mentors. When this case was argued in January 1996, Petitioners additionally argued that homebound students are being discriminated against by not receiving the same quality of

(3) a description of the homebound program which replaces the former homebound program, including questions set out in (2)(a), (b), and (c) above;
(4) the Board's plan to resume continuity of the homebound program;
(6) a report on other West Virginia counties' homebound programs and how each is implemented; and
(7) and other questions the Special Master deems necessary and appropriate.

7. Eligibility for homebound instruction pursuant to Policy 2419, is determined by whether an individual: a. has an injury, noncommunicable illness, or health condition which prevents her or him from attending school for more than three weeks cumulatively as diagnosed and confirmed by a licensed physician; or b. has an injury or health problem/condition that requires the student to be homebound or hospitalized for a period that has lasted or will last more than three weeks as diagnosed and confirmed by a licensed physician.

8. For the 1993–94 school year, there were more than 50 teachers who were paid on an hourly basis for providing homebound instructional services.

9. The individuals holding these eliminated positions were transferred to other positions. Petitioners McGuire, McHugh, Lester, and Connelly were transferred to classroom teaching positions based on seniority and certification. Petitioner Palmer retired effective August 22, 1994, and Petitioner Hale was reemployed in the capacity of school psychologist.

10. According to the Respondent Board and Respondent Marple, "[t]he projected cost to maintain the status quo, i.e., 7 full-time teachers and payment of Nine Dollars per hour[], was $551,640.00[,] [whereas] [t]he projected cost to eliminate the 7 full-time positions and payment of Fifteen Dollars per hour was $479,055.00."

teaching instruction as classroom students.[11]

The Respondent Board and Respondent Marple maintain that there is no legal requirement that homebound instruction be provided by regular full-time teachers. Recognizing that the state is required constitutionally to provide " 'a thorough and efficient system of free schools[,]' " Syl. Pt. 3, in part, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 861 (1979), Respondents argue that nothing contained in *Kelly* "may be reasonably construed as a finding that status as a full-time teacher is necessary for the provision of quality instruction."[12] Moreover, these Respondents emphasize that "[t]he evidence produced before the Special Master in the present case does not establish any measurable or reliable link between status as a regular full-time teacher and quality of instruction." The Respondents maintain additionally that "the evidence [failed to] establish that the level of compensation provided to homebound teachers resulted in a disadvantage to the District's ability to employ licensed, certified teachers." Respondents further argue that there is no statutory requirement that requires homebound instruc-

tion be provided exclusively by regular full-time teachers. They suggest that West Virginia Code §§ 18A–1–1(a) and 18A–4–16(1),[13] when viewed in pari materia, both authorize and establish the framework for compensation of teachers on an hourly basis.

In an amici curiae brief filed on behalf of the West Virginia Association of School Administrators and the Boards of Education of Harrison, Jackson, Marion, Mineral, Raleigh, Roane, Tucker, Wayne, and Wetzel Counties (hereinafter referred to as the "administrator amici"), an important clarification of the issue under consideration is made. Because, as these amici explain, the record is devoid of any finding or suggestion that any of the homebound services will be provided by teachers who are not already under contract to the Board either as full-time teachers or as substitute teachers, this case does not present the issue of whether school boards may contract with non-employees for professional services.[14]

During the presentation of oral arguments before this Court on October 31, 1995, we requested that additional briefs be submitted to address several related issues.[15] Subse-

**11.** In support of this position, Petitioners state that non-full-time teachers are hired without regard to the highest qualifications, are not annually evaluated, do not receive formal continuing education in connection with their homebound teaching, and have no regular supervision.

**12.** Upon remand to the circuit court, the lower court in *Kelly* found that counties must have the ability to "attract and maintain a high quality staff." Respondents argue that the requirement of quality instruction has historically been measured by licensure, certification, and availability, as defined by competitive levels of compensation, rather than by the nature of an individual's employment status. Petitioners argue that the Board's plan to utilize hourly-paid teachers or substitute teachers necessarily suggests that homebound teachers will not be hired on the basis of competitive qualification. While we find it unnecessary to address this issue, we observe that professional personnel who choose to work less than a full-time schedule make their decision for a variety of reasons, some of which include a need or desire to spend additional hours with their own families. Therefore, this line of reasoning is in no way intended to suggest that those homebound teachers who have worked on an hourly-pay basis are themselves less qualified. But the long-term effect of offering reduced benefits for these teaching positions could result in the filling of homebound positions with individu-

als who are less competitive under the statutory criteria established for hiring. *See* W. Va.Code § 18A–4–7a.

**13.** West Virginia Code § 18A–1–1(a) defines "school personnel" as "all personnel employed by a county board of education whether employed on a regular full-time basis, an hourly basis or otherwise." *See infra* note 22 for the text of West Virginia Code § 18A–4–16(1).

**14.** This distinction is important as Petitioners rely heavily on this Court's decision in *O'Connor v. Margolin,* 170 W.Va. 762, 296 S.E.2d 892 (1982), interpreting statutory language to conclude that the Legislature intended for state employees, and not private contractors, to provide janitorial services. *Id.* at 767, 296 S.E.2d at 897. Petitioners seek to expand the limited *O'Connor* holding to prohibit the Board from contracting with private or other entities for the duties performed by the homebound instructors.

**15.** Those issues which we requested the parties to address were:

(1) the precise, actual employment status, and, if it be different, the lawful and proper employment status in the view of the parties, under the applicable statutes, of those teachers, who would or should provide homebound instruction under

quent to oral argument in January 1996, we sought additional amicus briefs from the West Virginia Education Association ("WVEA"), the West Virginia Advocates, and the West Virginia Federation of Teachers in the interest of soliciting pertinent statutory and factual information from all interested groups.

## II.

We begin our analysis with a brief overview of the applicable state and federal laws that impact upon this case. The parties concur that the federal statutes pertinent to our consideration include the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994); the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1491o (1994); and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213 (1994). Section 504 of the Rehabilitation Act states in pertinent part:

No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be de-

nied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). While the ADA provides the same rights and remedies to persons with disabilities as the Rehabilitation Act, its protections are more expansive since the ADA applies to *all* public entities and not just those receiving federal funds.[16] *Coleman v. Zatechka*, 824 F.Supp. 1360, 1367 (D.Neb.1993) (citation omitted). The IDEA language that Petitioners cite is the mandate of a "free and appropriate public education"[17] for children with disabilities.[18] 20 U.S.C. § 1400(c); *see Board of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982) (finding that "free appropriate public education" requirement of IDEA "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction").[19]

---

the plan proposed by the respondent, Kanawha County Board of Education, who are not regular, full-time teachers with a continuing contract pursuant to West Virginia Code § 18A–2–2, including copies of any document related to the employment of such teachers; (2) whether the plan proposed by the respondent, Kanawha County Board of Education, comports with rules and/or regulations; (3) whether the plan proposed by the respondent, Kanawha County Board of Education, comports with applicable federal statutes, including, but not limited to, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, the Individuals with Disabilities Education Act, and any other federal enactment applicable to the instructional rights of handicapped, disabled, and/or homebound students, including any relevant federal or state rules and/or regulations promulgated pursuant to such federal statutes, as well as federal or state decisional authority regarding the instructional rights of handicapped, disabled, and/or homebound students; and (4) any other issues deemed by the parties and/or amici to further be relevant in light of the foregoing issues.

16. The ADA provides, in relevant part, that:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. A disability under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102.

17. The term "free appropriate public education" is defined as

special education and related services that— (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).

18. Disabilities are defined under the IDEA as "mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." 20 U.S.C. § 1401(a)(1)(A)(i).

19. According to the court in *Capistrano Unified School District v. Wartenberg*, 59 F.3d 884 (9th Cir.1995), a child is receiving the required "free appropriate public education" only if the "pro-

Specific state laws that apply include the constitutional mandate of section one of article XII, that "[t]he legislature shall provide, by general law, for a thorough and efficient system of free schools...." W. Va. Const. art. XII, § 1. As amplification for this mandate, Petitioners cite the legislated standard that "[h]igh quality educational standards shall be provided all public school students on an equal educational opportunity basis." W. Va.Code § 18–9A–22 (1994). The Special Master also referenced as applicable the statutes pertaining to the education of exceptional children. *See* W. Va.Code §§ 18–20–1 to –9 (1994 & Supp.1995).

■ Petitioners' argument, when summarized, is essentially that only through full-time instructors can quality education be imparted to homebound students and thus, the state-mandated goal of providing a quality education to "all public school students on an equal educational opportunity basis" be met. W. Va.Code § 18–9A–22. Although Petitioners cite provisions in the Rehabilitation Act, the IDEA, and the ADA, their own expert admitted in the proceeding before the Special Master that "neither Part B of IDEA or Section 504 [of the Rehabilitation Act] requires instruction by full-time personnel[.]" After conducting our own review of the pertinent federal acts, we reach the same conclusion as Petitioners' expert—personnel standards in terms of full versus part-time instruction are simply not addressed within these acts. *See Conecuh County, Al. Sch. Dist.*, 21 IDELR 805 (1994) (noting that Section 504 of the Rehabilitation Act "do[es] not set forth requirements for teachers"). The only reference to personnel standards that we located was in Part B of the IDEA. *See* 20 U.S.C. § 1413(a)(14). Pursuant to regula-

tions enacted in connection with the IDEA, states are required to establish and maintain standards for entry-level employment of personnel that "[a]re based on the highest requirements in the State applicable to the profession or discipline in which a person is providing special education or related services." 34 C.F.R. § 300.153(a)(1)(i) (1995). Additionally, the IDEA requires that states establish and maintain standards for ensuring that personnel necessary to carry out the purposes of Part B are adequately prepared and trained. 20 U.S.C. § 1413(a)(14); *see* 34 C.F.R. § 300.153(b)(1); *see also* 34 C.F.R. § 300.153(b)(2) (stating that standards developed to comply with Part B of IDEA must be "consistent with any State approved or recognized certification, licensing, registration, or other comparable requirements that apply to the profession or discipline in which a person is providing special education or related services"). The record does not indicate that Petitioners are making any claim against the Respondents centered on noncompliance with these personnel standards.

Simply put, Petitioners have not provided evidence of any violation of federal law stemming from the provision of homebound instruction by hourly as opposed to full-time instructors.[20] We note additionally that both the IDEA and the Rehabilitation Act have extensive remedial procedures in place which can be utilized by Petitioners in the event they identify a specific violation of these Acts. *See* 20 U.S.C. § 1415; *Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989).

### III.

Because the federal acts do not address the issue at hand, we look to state law. At

---

gram (1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities, and (3) is in accord with the individualized education program." *Id.* at 893; *see also Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985) (recognizing that board of education does not "discharge its duty under the ... [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial").

**20.** We observe additionally that even the WVEA and the West Virginia Advocates phrase their

concerns regarding the Board's plan in terms of stating that the plan "appears to violate" Section 504 and the ADA. Thus, these amici implicitly acknowledge no outright violations. We are not suggesting, however, that the concerns raised by Petitioners regarding continuity of instruction are not valid. Since a child subject to the IDEA has a right to have his unique needs evaluated and addressed through the formulation of an individualized education program ("IEP"), the specific need for continuity of instruction might be an appropriate component of a child's IEP.

the center of Petitioners' argument that the Board should be prohibited from effectuating its plan is the definition of "teacher" found in West Virginia Code § 18–1–1(g) (1994). That statute provides that "teacher"

> shall mean teacher, supervisor, principal, superintendent, public school librarian; registered professional nurse, licensed by the West Virginia board of examiners for registered professional nurses and employed by a county board of education, who has a baccalaureate degree; *or any other person regularly employed for instructional purposes in a public school in this state* [.]

*Id.* (emphasis supplied). This definition is expressly incorporated into Chapter 18A of the West Virginia Code, the chapter that deals with school personnel rights. *See* W. Va.Code § 18A–1–1 (1993). Based on the inclusion of the terms "regularly employed" [21] within the definition of teacher, Petitioners reason that being a teacher within the meaning of West Virginia Code § 18–1–1(g) contemplates employment that is covered by a teacher's contract under West Virginia Code § 18A–2–2 (1993). Petitioners emphasize that the initial paragraph of West Virginia Code § 18A–2–2 is written in terms of *every* teacher having a contract of employment:

> *Before entering upon their duties, all teachers shall execute a contract with their boards of education,* which contract shall state the salary to be paid and shall be in the form prescribed by the state superin-

tendent of schools. Every such contract shall be signed by the teacher and by the president and secretary of the board of education, and when so signed shall be filed, together with the certificate of the teacher, by the secretary of the office of the board.

*Id.* (emphasis supplied). According to Petitioners, the Legislature has expressed a clear mandate that this state's public school teachers be employed pursuant to contract. *See* W. Va.Code § 18A–2–2; *see also* W. Va.Code 18A–4–16 (requiring contracts for extracurricular assignments). By eliminating seven contractual full-time positions, the Petitioners contend that the Board is attempting to circumvent the statutory scheme which requires the contractual employment of teachers. *See* W. Va.Code § 18A–2–2.

In response to Petitioners' arguments, the Respondent Board focuses on a separate definition, that of the term "school personnel." Under West Virginia Code § 18A–1–1, "school personnel" is defined as "personnel employed by a county board of education whether employed on a regular full-time basis, an *hourly basis* or otherwise." *Id.* (emphasis supplied). According to the Board, this reference to hourly employment combined with the extracurricular assignments statute, West Virginia Code § 18A–4–16,[22] provide the necessary framework for the Board's plan to hire homebound teachers on an hourly basis. The language within the extracurricular statute that the Board relies upon is the phrase "*instructing*, coaching,

---

**21.** The term "Regular full-time employee" is defined within West Virginia Code § 18–1–1(i) as "any person employed by a county board of education who has a regular position or job throughout his employment term, without regard to hours or method of pay."

**22.** West Virginia Code § 18A–4–16 states in pertinent part:

> (1) The assignment of teachers and service personnel to extracurricular assignments shall be made only by mutual agreement of the employee and the superintendent, or designated representative, subject to board approval. Extracurricular duties shall mean, but not be limited to, any activities that occur at times other than regularly scheduled working hours, which include the instructing, coaching, chaperoning, escorting, providing support services

or caring for the needs of students, and which occur on a regularly scheduled basis.

> (2) The employee and the superintendent, or a designated representative, subject to board approval, shall mutually agree upon the maximum number of hours of extracurricular assignment in each school year for each extracurricular assignment.

> (3) The terms and conditions of the agreement between the employee and the board of education shall be in writing and signed by both parties.

> (4) An employee's contract of employment shall be separate from the extracurricular assignment agreement provided for in this section and shall not be conditioned upon the employee's acceptance or continuance of any extracurricular assignment proposed by the superintendent, a designated representative, or the board.

chaperoning, escorting, providing support services or caring for the needs of students, ... which occur on a regularly scheduled basis." W. Va.Code § 18A–4–16(1) (emphasis supplied). Simply stated, the Board's position is that the Legislature has expressly authorized county boards of education to compensate school personnel on an hourly basis. *See* W. Va.Code § 18A–1–1(a).

■ While we agree with the Respondent Board that West Virginia Code § 18A–1–1(a) references, through definition, the hiring of personnel on an hourly basis, we are unconvinced that the extracurricular statute, West Virginia Code § 18A–4–16, applies to teachers who provide homebound instruction. As the WVEA explained in its amicus brief, West Virginia Code § 18A–4–16 was specifically enacted in response to this Court's decision in *State ex rel. Hawkins v. Tyler County Board of Education*, 166 W.Va. 363, 275 S.E.2d 908 (1980). *Hawkins* involved a challenge by a teacher to the school board's authority to reassign her due to her refusal to coach basketball in addition to her regular teaching responsibilities. We held in *Hawkins* that school boards could not assign teachers to coaching duties without their express consent, and more importantly, could not condition their teaching employment upon acceptance or continuation of coaching duties. *Id.* at 373–74, 275 S.E.2d at 915–16.

Immediately following *Hawkins,* the Legislature enacted West Virginia Code § 18A–4–16, which statutorily requires a teacher's express consent to extracurricular responsibilities as well as a separate contract setting forth the specific number of hours and remuneration for such additional duties. *See* W. Va.Code § 18A–4–16. Based on the underlying rationale for the enactment of the extracurricular statute, the WVEA maintains that the inclusion of the term "instruction" within that statute must be viewed "narrowly, in a logical manner, consistent with the text of [the] statute itself, and be interpreted to include only that type of instruction associated with traditional extracurricular activities, and not the 'instruction' of core curriculum." As additional support for its position, the WVEA notes that by requiring a separate contract for extracurricular assignments, the

Legislature intended a distinction between curricular and extracurricular activities. *See Cruciotti v. McNeel,* 183 W.Va. 424, 428, 396 S.E.2d 191, 195 (1990) (holding that "teacher's contract of employment shall be separate from an agreement to perform duties as an athletic trainer"). We agree with the arguments advanced by the WVEA and accordingly, conclude that West Virginia Code § 18A–4–16 does not provide authority for the hiring of homebound instructors on an hourly basis.

■ Another provision which fails to provide support for Respondents' position is found in West Virginia Code § 18A–2–3. That statute, which addresses the employment of substitute teachers, clearly only applies when there is either a temporary absence of a teacher during the school term, a teacher on leave of absence, or some other board-approved teacher absence. *See id.* The situation presented by the Board's proposed plan to utilize non-full-time teachers in the stead of full-time teachers does not arise out of any of the "absence" scenarios contemplated by West Virginia Code § 18A–2–3.

Having excluded both the extracurricular and the substitute teacher statutes, we turn to the more generalized statutory provisions that address teacher pay and benefits to determine whether they offer any assistance. As a starting point, we recognize the contractual underpinning of the rights and benefits afforded to this state's public school teachers. West Virginia Code § 18A–2–2 is clear in its directive that "all teachers *shall* execute a contract with their boards of education." *Id.* (emphasis supplied) Upon obtaining a contract pursuant to West Virginia Code § 18A–2–2, teachers are afforded various protections regarding assignment, transfer, promotion, demotion, and suspension. *See* W. Va.Code § 18A–2–7. In addition to these protections, teachers are statutorily provided salaries and other benefits. *See generally* W. Va.Code §§ 18A–4–1 to –19 (1993 & Supp.1995). The state minimum salary schedule is provided in West Virginia Code § 18A–4–2 and West Virginia Code § 18A–4–5a permits county boards of education to supplement teacher salaries. With little exception, the various benefits provided to

teachers are dependent on their status as full-time employees. *See* W. Va.Code § 18A–4–10 (providing for personal leave); W. Va.Code § 18A–4–10a (granting bonus for unused personal leave days); W. Va.Code § 18A–4–11 (providing for group insurance); W. Va.Code § 18A–4–12 (delineating eligibility for tax deferred investments); *cf.* W. Va.Code § 18A–4–14 (granting duty-free lunch and planning periods for teachers employed for more than one-half the class periods of regular school day).

▮ It is readily apparent that the Board's incentive for enacting the plan at issue was the elimination of both salaries subject to minimum pay scales and the various benefits that are afforded to full-time teachers. Given the absence of any evidence by the Board that there is a reduction in the number of students eligible for homebound instruction, we can reach but one conclusion: that the Board has opted to reduce the number of full-time teaching positions with the attendant benefits provided by statute with the sole motivation of saving funds. Indeed, the Board does not dispute this attributed motivation. Thus, the true issue presented by this case is whether a board can eliminate existing full-time teaching positions with no showing of any reduction in need for such services and then fill the instructional needs previously met through those positions by hiring individuals on an hourly-pay basis. Under the Board's logic regarding its authorization to fill its homebound teaching positions with hourly-paid employees, a board of education could decide that all of its kindergarten teachers or all of its science teachers, for example, should be hourly employees in order to reduce expenses associated with the provision of benefits enjoyed by full-time teachers.

▮ We must consider the Board's proposed plan against the axiom that " '[s]chool personnel regulations and laws are to be strictly construed in favor of the employee.' Syl. pt. 1, *Morgan v. Pizzino*, 163 W.Va. 454, 256 S.E.2d 592 (1979)." Syl. Pt. 1, *Cruciotti*, 183 W.Va. at 424, 396 S.E.2d at 191. At the same time, however, " '[c]ounty boards of education have substantial discretion in matters relating to the hiring, assignment, transfer, and promotion of school personnel.' " *State ex rel. Melchiori v. Bd. of Educ.*, 188 W.Va. 575, 580, 425 S.E.2d 251, 256 (1992) (quoting Syl. Pt. 3, *Dillon v. Bd. of Educ.*, 177 W.Va. 145, 146, 351 S.E.2d 58, 59). " 'Nevertheless, this discretion must be exercised reasonably, in the best interests of the schools, and in a manner which is not arbitrary and capricious.' " *Id.*

In *Melchiori*, we further recognized that "[t]his Court has a duty to oversee that the objective of filling this State's schools with 'qualified instructional personnel' is met." 188 W. Va. at 581, 425 S.E.2d at 257 (quoting *Dillon*, 177 W.Va. at 148, 351 S.E.2d at 61). The Board's plan has arguably affected the pool of teachers qualified for homebound instruction. In eliminating the full-time homebound instruction positions, the Board has reduced substantially the attractiveness of homebound instruction for those individuals who previously had full-time positions in that area. To be sure, those individuals could opt to be hourly employees to remain in this unique area in which they have been teaching and presumably are qualified, experienced, and committed.[23] But, to do so, they would have to take a cut in pay, lose medical benefits, and all other benefits attendant to full-time employment. Since the clear and immediate effect of the Board's plan was the relocation of the formerly full-time homebound teachers to classroom positions, the pool of qualified homebound instructors was instantly reduced.

While any previously full-time homebound teacher might choose to remain in the position upon its reduction to an hourly position,[24] we find nothing in the statutes that

---

**23.** This Court recognizes that it takes a special individual to accept and handle the demands and even, at times, the dangers posed by and inherent to homebound instruction. We further recognize that, despite the proposed redesigning of the homebound positions in terms of pay and benefits, there would remain individuals who, be-

cause of their dedication to helping students in these special needs situations, would nonetheless choose to remain in these positions.

**24.** This Hobson's choice offered to full-time homebound teachers is evidenced by the fact that all of the formerly full-time homebound instruc-

authorizes a board of education to select any one classification of teachers providing full-time instruction and then require that classification to provide instructional services on an hourly-pay basis without any concomitant showing of reduced need for such instruction. While we find validity in Petitioners' concern that continuity of instruction is an important feature of successful homebound instruction,[25] we do not turn our decision on that issue, as the quality and efficacy of instruction may more properly be a matter left to the discretion and expertise of the Board. Instead, it is the absence of any authorization within the statutes that would permit the Board to depart from the statutory requirements for any particular area of instruction that we find compelling and dispositive.

In implementing its plan, the Board permitted the formerly full-time instructors to "bump" into classroom positions pursuant to the provisions of West Virginia Code § 18A–4–7, also known as the reduction in force ("RIF") statute. This statute sets forth specific procedures that apply "[w]henever a county board is required to reduce the number of professional personnel in its employment." W. Va.Code § 18A–4–7a. The RIF statute further provides that "the employee with the least amount of seniority shall be properly notified and released" and permits "an employee subject to release" to bump into "any other professional position where such employee is certified and was previously employed or to any lateral area for which such employee is certified and/or licensed." *Id.*

Without any demonstrated reduction in need for homebound teaching services, the Board arbitrarily chose to eliminate the full-time homebound teaching positions. Under the least seniority first method that is statutorily required for accomplishing a RIF, it would seem more appropriate, if in fact a reduced need existed, that the hourly homebound teachers should have been subjected to a loss of positions, rather than eliminating from the top down as the Board appears to be doing here. Obviously, the explanation for the Board's action is that more money could be saved by eliminating the full-time positions rather than the hourly positions.

While Petitioners sought through this original proceeding to obtain a directive from this Court requiring the Board to utilize only full-time teachers for homebound instruction, we are without authority to grant such relief. However, with regard to those Petitioners who were formerly full-time homebound teachers, we conclude that the Board wrongly subjected those individuals to transfer pursuant to West Virginia Code § 18A–4–7a. Because relief in mandamus is expressly provided by West Virginia Code § 18A–4–7,[26] we determine that a board of education is prohibited from abolishing the positions of full-time homebound teachers and replacing the instructional services performed by those teachers with hourly-paid employees when no concomitant showing of reduction in need for such instruction has been made on the grounds that such a plan clearly operates in contravention of the contractual scheme of employment contemplated by West Virginia Code § 18A–2–2 along with the attendant benefits of such contracts. By

tors who did not retire utilized their seniority to "bump" into traditional classroom teaching positions pursuant to West Virginia Code § 18A–4–7a.

**25.** Petitioners' expert witness, Dr. David Rostetter, testified "that consistency of the teacher is important in that the relationship between the student and the teacher is essential, and that every time you change the relationship, the learning changes." The Board itself recognizes the need for continuity as evidenced by the fact that a proposed regulation contains a continuation clause in the contracts of homebound teachers "that will require that home/hospital instruction be continued for the duration of the

disability not to extend beyond the then current school year." The proposed regulation further restricts an hourly or substitute teacher who is the successful applicant for a full-time position from "assum[ing]" such position until the commencement of the next ensuing semester."

**26.** West Virginia Code § 18A–4–7a states in relevant part that "[a]ny board failing to comply with the provisions of this article may be compelled to do so by mandamus." Because we conclude that the Board wrongly utilized the transfer procedures contained in West Virginia Code § 18A–4–7a, we grant, in effect, a negative writ of mandamus.

this ruling, we are not proscribing the hiring of homebound teachers on an hourly-pay basis. We certainly recognize that many of this state's counties may not have a continuing need for full-time homebound teachers.[27] Our ruling today turns on the elimination of full-time positions and the attendant benefits of such positions without a showing of reduced need for full-time instruction.

Should the Legislature desire to authorize the hiring of hourly teachers with regard to homebound teaching services in the manner proposed by the Board in the instant case, or in some other manner, they may properly do so by legislative enactment.

Based on the foregoing, we grant a writ of mandamus to prevent implementation of the Board's plan.

Writ granted in part.

MILLER, Retired Justice, sitting by temporary assignment.

McHUGH, C.J., deeming himself disqualified, did not participate in the consideration or decision of this case.

27. As recognized by the Special Master, 26 counties other than Kanawha hire homebound instructors on an hourly-pay basis. There was some indication in oral argument that the reason for such part-time hiring is a lack of need for full-time instruction in many of the smaller counties.