489 S.E.2d 257

STATE of West Virginia, Plaintiff
Below, Appellee

v.

Charles Rhea HINKLE, Defendant
Below, Appellant

No. 23424.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 11, 1996.

Decided Oct. 31, 1996.

Timothy L. Sweeney, Prosecuting Attorney, St. Marys, for Appellee.

John M. Butler, St. Marys, for Appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, Charles Rhea Hinkle, appeals a verdict by a jury in the Circuit Court of Pleasants County of guilty of involuntary manslaughter. By order dated May 17, 1995, the circuit court denied the defendant's motions for a judgment of acquittal and a new trial, and sentenced him to one year in the Pleasants County jail. This appeal ensued.[1]

I.

## FACTUAL AND PROCEDURAL HISTORY

On June 12, 1993, the defendant finished his work shift at the Ormet Corporation, an aluminum plant in Hannibal, Ohio, at approximately 4:00 p.m. He obtained a ride to the Village Inn tavern in Paden City, West Virginia.[2] At the tavern, the defendant made several telephone calls attempting to locate someone to give him a ride to his car.[3] The defendant also ordered a can of beer, and drank approximately one-third of the beer. While at the tavern, the defendant complained of not feeling well, dizziness, and double vision. The tavern owner's daughter then agreed to take the defendant to retrieve his car. As he was leaving the bar, the defendant took an unopened can of beer with him.

---

1. The Honorable Arthur M. Recht resigned as Justice of the Supreme Court of Appeals of West Virginia effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing October 15, 1996, and continuing until further order of this Court.

2. The defendant was living with his son in Paden City, West Virginia.

3. The defendant and his wife recently were separated and were arguing about which of them would retain possession of their automobile. It appears from the record that the defendant parked the car in the locks and dam parking lot in Ohio, across the river from New Martinsville, West Virginia, so his wife would not be able to locate the automobile and take possession of it.

At approximately 7:30 p.m., the defendant was traveling north on Route 2 in St. Marys, West Virginia.[4] Robert Barrett was driving south on Route 2 with his wife, Charlotte Ann Barrett. It appears the defendant's car gradually crossed the centerline and traveled in a straight line for approximately two hundred yards in the southbound lane before it collided head-on with the Barrett automobile.[5] As a result of the accident, the defendant and Mr. Barrett suffered severe injuries. Mrs. Barrett also sustained serious injuries, and died as a result of those injuries. Eyewitnesses reported the defendant crossed the centerline in a consistent, even fashion without attempting to swerve, brake, change directions, or stop.[6] Witnesses also indicated that both the defendant and Mr. Barrett were traveling at the posted speed limit. A bystander stated the defendant was semi-conscious immediately after the accident, and his breath smelled of alcohol.

An investigation of the defendant's vehicle immediately after the accident revealed one open can of beer, which was one-half full, in the driver's door compartment; several empty beer cans on the passenger's floor; four full beer cans on the rear floor; three empty beer cans on the driver's floor; and an empty glass, which smelled of beer, on the ground near the car. The defendant was transported to Camden Clark Memorial Hospital where testing revealed he had a blood alcohol level of less than one hundredth of one percent. Officer Charles Templeton of the Pleasants County Sheriff's Department, who investigated the accident, also requested that a blood sample from the defendant be tested by the crime lab. The crime lab found the defendant's blood alcohol level to be less than one thousandth of one percent, well below the statutory definition of intoxication.[7] While treating the defendant's injuries, he was given a Magnetic Resonance Imaging [MRI] scan to determine whether he had sustained any head injuries. The MRI results indicated the defendant had an undiagnosed brain disorder in the portion of his brain that regulates consciousness.

On September 13, 1993, a Pleasants County grand jury returned an indictment charging the defendant with the misdemeanor offense of involuntary manslaughter while driving a motor vehicle in an unlawful manner in violation of W. Va.Code, 61–2–5 (1923). The defendant stood trial, by jury, for this charge in Pleasants County on March 1, 1995. During the trial, the defendant's son testified that the defendant had been having memory loss for several months prior to the accident, and that he believed the defendant had seen a doctor in New Martinsville, West Virginia. Similarly, the tavern owner stated the defendant had complained of feeling ill during the months preceding the collision,[8] and he had complained of dizziness, memory

4. It seems that after the defendant retrieved his automobile, he traveled south in Ohio and crossed a bridge over the Ohio River to St. Marys, West Virginia, rather than crossing the Ohio River into New Martinsville, West Virginia.

5. Witness accounts indicate Mr. Barrett attempted to avoid the collision by swerving off the road and braking.

6. There was no evidence of skid marks at the accident scene.

7. W. Va.Code, 17C–5–8 (1983), provides, in pertinent part:

"[U]pon the trial of any civil or criminal action arising out of acts alleged to have been committed by any person driving a motor vehicle while under the influence of alcohol, controlled substances or drugs, evidence of the amount of alcohol in the person's blood at the time of the arrest or of the acts alleged, as shown by a chemical analysis of his blood, breath or urine, is admissible . . . and shall give rise to the following presumptions or have the following effect:

"(a) *Evidence that there was, at that time, five hundredths of one percent or less, by weight, of alcohol in his blood, shall be prima facie evidence that the person was not under the influence of alcohol;*

"(b) Evidence that there was, at that time, more than five hundredths of one percent and less than ten hundredths of one percent, by weight, of alcohol in the person's blood shall be relevant evidence, but it is not to be given prima facie effect in indicating whether the person was under the influence of alcohol;

"(c) Evidence that there was, at that time, ten hundredths of one percent or more, by weight, of alcohol in his blood, shall be admitted as prima facie evidence that the person was under the influence of alcohol[.]" (Emphasis added).

8. The tavern owner indicated the defendant was a regular patron of her establishment.

loss, and double vision on the night of the accident. She, too, believed the defendant recently had been treated by a physician.

Defense witness, Ronald Washburn, M.D.,[9] reported the defendant's MRI scan showed an undiagnosed brain disorder affecting the reticular activating system of his brain. Dr. Washburn reasoned that because this portion of the brain affects one's consciousness, this disorder could have caused the defendant to suddenly lose consciousness immediately before the collision.[10] He also indicated the defendant had developed this brain abnormality approximately four to eight months prior to the accident,[11] and the disease was not caused by chronic alcohol abuse. Testifying further, Dr. Washburn surmised the defendant's prior memory loss was a symptom of his brain disorder, but his other complaints of not feeling well, dizziness, and blurred or double vision were not related to this disease.[12] Concluding his opinion, Dr. Washburn determined the defendant's brain disorder would not have been diagnosed if he had not had an MRI scan after the accident. Finally, both the defendant and Mr. Barrett testified they could not recall any details of the automobile accident.[13]

The trial court denied the defendant's motion to dismiss the indictment [14]; his motion to suppress all evidence obtained immediately after the accident showing the presence of alcoholic beverage containers in or around the defendant's car, and statements indicating the defendant and his car smelled of alcohol; and his motions for a directed verdict of acquittal.[15] The trial court further denied the defendant's proposed jury instruction regarding the insanity defense,[16] to which defense counsel objected.[17] Determin-

9. The trial court qualified Dr. Washburn as an expert in the field of diagnostic radiology.

10. It does not appear the defendant ever had lost consciousness prior to the accident of June 12, 1993.

11. Dr. Washburn based his opinion, in part, on the defendant's medical records from March, 1993.

12. Dr. Washburn attributed the remaining symptoms not associated with the defendant's brain disorder to his chronic sinusitis.

13. During oral arguments before this Court, counsel for the defendant represented that the defendant sustained closed head injuries as a result of the automobile accident. Due to these injuries and his brain disorder, the defendant has not returned to work or driven an automobile since the collision on June 12, 1993.

14. The defendant moved to dismiss the indictment, arguing the State had not proven that he committed any illegal act, other than driving left of center, because his blood alcohol level did not indicate he was under the influence of alcohol. For the statutory definition of "under the influence," see note 7, supra.

15. The defendant moved for a directed verdict of acquittal at the close of the State's case and at the end of the trial.

16. The defendant's proposed jury instruction Number Ten provides:

"The Court instructs the jury the driver of a motor vehicle is not liable criminally for conduct which they [sic] otherwise would [sic] if he or she was 'insane' at the time. 'Insanity' is a legal term of art which means when at the time of the offense the defendant has a mental disease or defect from which the criminal acts resulted and which caused the defendant to lack the capacity to appreciate the wrongfullness [sic] of his conduct or to conform his actions to the requirements of the law, what the law refers to [sic] condition [sic] as 'insanity'. The State of West Virginia has the burden to prove the sanity of the defendant along with the other elements of the crime alleged by proof beyond a reasonable doubt once the defendant presents some evidence of insanity. Therefore, before you may find the defendant, Charles Rhea Hinkle [sic] guilty of involuntary manslaughter as otherwise instructed, the State of West Virginia must prove to the satisfaction of the jury that on or about June 12, 1993 Charles Rhea Hinkle did not suffer from a mental disease or defect from which the criminal action resulted which either prevented him from appreciating the wrongfullness [sic] of his actions or prevented him from conforming his actions to the requirements of the law. If the jury has a reasonable doubt as to any one of these elements, you shall find the defendant, Charles Rhea Hinkle, not guilty by reason of insanity."

The trial court noted on the refused instruction that it was "not supported by [the] evidence" and that it was "misleading given [the] other instructions."

17. Counsel for the defendant noted his objection as follows:

"THE COURT: [D]efendant's jury instruction number ten is refused as not supported by the evidence and misleading given the other instructions of the court.

* * * * * *

"THE COURT: Does the defendant have any objection to any instruction which was ten-

ing that the defendant's blood alcohol level did not establish that he was under the influence of alcohol, the trial court instructed the jury to find the defendant was not intoxicated at the time of the accident.[18] Likewise, the trial court directed the jury to find that the defendant suffered from a brain disorder affecting the consciousness-regulating portion of his brain.[19] The court further instructed the jury:

"[O]ne who suffers from an as yet undiagnosed disease or defect cannot be convicted of involuntary manslaughter for a death resulting from his operation of an automobile unless the State proves beyond a reasonable doubt that:

"1. The driver knew or should reasonably have known of the existence of his physical or mental condition, disease or defect; and,

"2. The driver should reasonably have foreseen that his condition, disease or defect would impair his ability to drive an automobile to such a degree so as to endanger human life; and,

"3. The driver's condition, disease or defect did contribute to the accident resulting in death; and,

"4. His decision to drive an automobile at the date and time and in the place set forth in the indictment was negligence so gross, wanton and culpable as to show a reckless disregard of human life; and,

"5. Indicated a conscious indifference to the probable dangerous consequences of driving so impaired.

"If the evidence fails to prove any of these matters beyond a reasonable doubt, then you shall find the defendant, Charles

Rhea Hinkle, not guilty of involuntary manslaughter as charged in the indictment.

"If the evidence proves each of these matters beyond a reasonable doubt then you may find the defendant, Charles Rhea Hinkle, guilty of involuntary manslaughter as charged in the indictment."

Following deliberations, the jury, on March 2, 1995, returned a verdict of guilty of involuntary manslaughter. By order dated May 17, 1995, the circuit court denied the defendant's motions for a judgment of acquittal and a new trial, and sentenced him to one year in the Pleasants County Jail.[20]

## II.

### DISCUSSION

Despite the additional issues raised, disposition of this appeal begins and ends with an inquiry into whether the jury instructions were inadequate. Thus, the appeal in this case has been limited to one issue: Whether the jury was instructed properly as to the defense of unconsciousness. The defendant claims the trial court committed reversible error when it refused to give his insanity instruction. On the other hand, the State contends the instruction offered by the defendant was imperfect, and the evidence did not support an insanity instruction. Moreover, the State urges the instructions offered were more than adequate to cover the defense of unconsciousness. This case requires us to harmonize a conflict between the defense of unconsciousness and that of insanity.

---

dered by the defendant and which was refused?

"MR. BUTLER: Specifically ten, yes.

\*   \*   \*   \*   \*   \*

"THE COURT: With those objections noted[.]"

18. The trial court instructed the jury as follows: "The Court instructs the jury, upon the evidence presented, as a matter of law, that the defendant, Charles Rhea Hinkle, was not under the influence of alcohol at the time of the accident subject of the indictment in this case[.]"

19. The trial court charged the jury:

"[T]he court further instructs the jury, upon the evidence presented, as a matter of law, that on the 12th day of June, 1993, at the time of the accident subject of the indictment, the defendant, Charles Rhea Hinkle, suffered from an organic disease or defect affecting that part of his brain which regulates or influences consciousness, that is, the mental state of wakefulness and sleep."

20. The circuit court subsequently held a restitution hearing and, by order dated July 20, 1995, ordered the defendant to make restitution payments of $4,237.85 to the Estate of Charlotte Ann Barrett, and $2,000.00 to Westfield Companies, Mrs. Barrett's automobile insurance provider.

## A.

### *Standard of Review*

■ In dealing with instructions, our standard of review is familiar. As a general rule, a refusal to give a requested instruction is reviewed for an abuse of discretion. When assessing whether the trial court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence. *See United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489, 502–03 (1975); *State v. Bradshaw*, 193 W.Va. 519, 543, 457 S.E.2d 456, 480, *cert. denied,* —— U.S. ——, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995).

■ A criminal defendant is entitled to an instruction on the theory of his or her defense if he or she has offered a basis in evidence for the instruction, and if the instruction has support in law. *See State v. LaRock*, 196 W.Va. 294, 308, 470 S.E.2d 613, 627 (1996). Thus, an instruction offered by the defense should be given if the proposed instruction: (1) is substantively correct, (2) is not covered substantially in the charge actually delivered to the jury, and (3) involves an important issue in the trial so the trial court's failure to give the instruction seriously impairs the defendant's ability to effectively present a defense. *State v. Derr*, 192 W.Va. 165, 180, 451 S.E.2d 731, 746 (1994). If these prerequisites are met, the trial court abuses its discretion in refusing the instruction "no matter how tenuous that defense may appear to the trial court." *United States v. Dove*, 916 F.2d 41, 47 (2nd Cir. 1990).

■ By contrast, the question of whether a jury was properly and adequately instructed is a question of law, and, thus, our review is *de novo*. We consider all the jury heard and, from the standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was mislead in any way and whether it had an understanding of the issues and its duty to determine those issues. *See State v. Guthrie*, 194 W.Va. 657, 671, 461 S.E.2d 163, 177 (1995). We will reverse a conviction only if the error was prejudicial when viewed in light of the entire record. In the present case, we find merit in the defendant's position, and hold that, without an adequate and complete explanation of the unconsciousness defense, the omission in the charge was likely to have created a grave miscarriage of justice.

## B.

### *Analysis*

The defendant argues he was entitled to an insanity instruction. Of course, the State contends otherwise. We agree partially with the State that technically the defense was one of unconsciousness as opposed to insanity. The law on the notion of unconsciousness in West Virginia is terribly undeveloped. This is, no doubt, the reason why the defendant requested an insanity instruction in this case, since that is where our older cases seem to place this claim. *See State v. Painter*, 135 W.Va. 106, 63 S.E.2d 86 (1950); *State v. Alie*, 82 W.Va. 601, 96 S.E. 1011 (1918). Indeed, there is only a paucity of American appellate courts that have discussed this defense. With regard to those jurisdictions, Section 44 of Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* (1972), one of the few treatises that gives this defense any extensive coverage, states: "A defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness." *Id.* at 337.

Interpreting this defense, the weight of authority in this country suggests that unconsciousness, or automatism as it is sometimes called, is not part of the insanity defense for several reasons. First, unconsciousness does not necessarily arise from a mental disease or defect. Although always containing a mental component in the form of loss of cognitive functioning, the causes and conditions are diverse; examples include epilepsy, concussion, gunshot wounds, somnambulism, coronary episodes, and certain brain disorders, as here.

*See generally* LaFave & Scott, *supra,* at 339–40. Additionally, these unconscious disorders tend to be acute, unlike most cases of insanity which are typically chronic. Because cases of unconsciousness are temporary, they do not normally call for institutionalization, which is the customary disposition following a successful insanity defense. *Id.* at 338.

A further, and probably the most significant, distinction between insanity and unconsciousness rests on the burden of proof issue. Because insanity leading to criminal behavior usually does not eliminate the mental state necessary for a finding of criminal culpability, the burden can be placed on the defendant to prove insanity.[21] *See Rivera v. Delaware,* 429 U.S. 877, 879–80, 97 S.Ct. 226, 227, 50 L.Ed.2d 160, 161 (1976) (appeal dismissed; Brennan, J., dissenting); *Leland v. Oregon,* 343 U.S. 790, 796–801, 72 S.Ct. 1002, 1006–09, 96 L.Ed. 1302, 1307–10 (1952). On the contrary, unconsciousness eliminates one of the basic elements of the crime—either the mental state or the voluntary nature of the act.[22] As such, once the issue of unconsciousness or automatism is raised by the defense, the State must disprove it beyond a reasonable doubt in order to meet its burden of proof with respect to the elements of the crime. *Patterson v. New York,* 432 U.S. 197, 215, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281, 295 (1977); *Mullaney v. Wilbur,* 421 U.S. 684, 701–04, 95 S.Ct. 1881, 1891–92, 44 L.Ed.2d 508, 521–22 (1975); *In re Winship,* 397 U.S. 358, 361–63, 90 S.Ct. 1068, 1071–72, 25 L.Ed.2d 368, 373–74 (1970). Our allocation of the burden of

proof is consistent with other West Virginia cases. *See* Syl. Pt. 4, *State v. Houston,* 197 W.Va. 215, 475 S.E.2d 307 (1996) (entrapment); Syl. Pt. 2, *State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981) (insanity); Syl. Pt. 4, *State v. Kirtley,* 162 W.Va. 249, 252 S.E.2d 374 (1978) (self-defense).

Unconsciousness is thus a separate and distinct defense from insanity. *See State v. Massey,* 242 Kan. 252, 257, 747 P.2d 802, 806 (1987); *State v. Caddell,* 287 N.C. 266, 290, 215 S.E.2d 348, 363 (1975). In order to keep this distinction conceptually clear, it is better to view unconsciousness as eliminating the voluntary act requirement rather than negating the mental component of crimes. Thinking of unconsciousness in this conceptual fashion helps to avoid the temptation to collapse it into insanity which, of course, also deals with mental conditions. The defense of unconsciousness should be recognized in a criminal trial and equated with epilepsy rather than insanity. We believe this is the way the claim of unconsciousness should be viewed jurisprudentially in West Virginia.

Accordingly, we hold that unconsciousness (or automatism) is not part of the insanity defense, but is a separate claim which may eliminate the voluntariness of the criminal act.[23] Moreover, the burden of proof on this issue, once raised by the defense, remains on the State to prove that the act was voluntary beyond a reasonable doubt. An instruction on the defense of unconsciousness is required when there is reasonable evidence that the defendant was unconscious

**21.** West Virginia law nevertheless places the burden on the State to disprove insanity beyond a reasonable doubt once the issue is raised by a defendant. *See Edwards v. Leverette,* 163 W.Va. 571, 576–78, 258 S.E.2d 436, 439–40 (1979). This approach is contrary to the current trend in the country which is to place the burden on the defendant to prove his insanity. We leave open for another day whether the burden of proof in insanity cases should be changed in West Virginia.

**22.** The defense of unconsciousness is analogous to the defense of accident or alibi, in that these defenses negate an essential element of the crime charged. In these two situations, the reason the burden of proof cannot be placed on the defen-

dant is that a prosecutor cannot secure a conviction unless the prosecution proves the killing was culpable or the defendant was present and participating at the time of the crime. The same legal analysis applies to unconsciousness. Proof that the act was done voluntarily necessarily negates unconsciousness. On the other hand, voluntary action and unconsciousness cannot coexist.

**23.** It has been a long-recognized tenet of criminal jurisprudence that the State punishes only voluntary acts. There also must be some level of intent for a person to be guilty of committing a crime. Thus, under usual circumstances, a person cannot be held responsible for an act he or she commits while unconscious.

at the time of the commission of the crime.[24] In the instant case, it is contended the defendant was, in fact, rendered unconscious at the time of the commission of the crime by reason of an undiagnosed brain disorder affecting the reticular activating system of his brain.[25]

█ Even if the trier of fact believes the defendant was unconscious at the time of the act, there is another consideration which occasionally arises. If the defendant was sufficiently apprised and aware of the condition and experienced recurring episodes of loss of consciousness, e.g., epilepsy, then operating a vehicle or other potentially destructive implement, with knowledge of the potential danger, might well amount to reckless disregard for the safety of others. Therefore, the jury should be charged that even if it believes there is a reasonable doubt about the defendant's consciousness at the time of the event, the voluntary operation of a motor vehicle with knowledge of the potential for loss of consciousness can constitute reckless behavior.

█ The next questions are whether the evidence in the present case was sufficient to justify an unconsciousness instruction, and, if so, whether the instruction given by the court was adequate. Finally, we must determine whether the issue regarding the sufficiency of the jury charge was properly preserved below. Jurisdictions appear divided as to whether the defense can be put in issue by only the defendant's testimony. In *Starr v. State*, 134 Ga.App. 149, 150, 213 S.E.2d 531, 532 (1975), the court found that additional corroboration was required and, without corroboration, such an instruction was not required. On the other hand, in *People v. Wilson*, 66 Cal.2d 749, 762, 59 Cal.Rptr. 156, 165, 427 P.2d 820, 829 (1967), the court said because a defendant is entitled to an instruction as to his defense, no matter how incredible his theory is, there need be no corroboration for the instruction to be given. In this case, we need not decide this issue since the defendant's testimony was sufficiently corroborated by expert testimony and other eyewitness testimony.[26] We find the evidence was sufficient to require an unconsciousness instruction. Moreover, in this case the issue appears moot because the trial court not only gave an instruction on the subject but, by such instruction, may very well have decided the issue of unconsciousness as a matter of law.

█ Four considerations lead us to reverse the defendant's conviction. First, although the defendant failed to request a specific instruction on unconsciousness, such failure is understandable given the confusion in our cases, essentially equating this claim with insanity.[27] The defendant did request,

---

24. The defense of unconsciousness must be distinguished from "blackouts" caused by the voluntary ingestion of alcohol or nonprescription drugs. If the evidence indicates that the unconsciousness is due to alcohol or drugs, as we discussed above, the case must be handled as an intoxication defense. *See State v. Less*, 170 W.Va. 259, 294 S.E.2d 62 (1981); *State v. Vance*, 168 W.Va. 666, 285 S.E.2d 437 (1981); *State v. Keeton*, 166 W.Va. 77, 272 S.E.2d 817 (1980); *State v. Bailey*, 159 W.Va. 167, 220 S.E.2d 432 (1975), *overruled on other grounds by State ex rel. D.D.H. v. Dostert*, 165 W.Va. 448, 269 S.E.2d 401 (1980).

25. Although we hold unconsciousness to be a defense separate and apart from insanity, in that unconsciousness does not result from a disease or mental defect, it does not follow that the procedural requirements of the two should be different. Thus, where a defendant elects to assert the defense of unconsciousness, it is fair to require the defendant to comply with all the procedural requirements of Rule 12.2 of the West

Virginia Rules of Criminal Procedure, including the pretrial notice requirement.

26. Even though we decline to address the issue of corroboration head-on, in order to avoid a flood of false and manufactured unconsciousness defenses, an impressive number of jurisdictions seems to favor the corroboration requirement. In these jurisdictions, some substantial corroboration is necessary to trigger the unconsciousness defense. For example, evidence that a defendant does not remember, without other eyewitnesses or expert testimony, is insufficient to carry the issue to the jury. To require otherwise, it is suggested, would place an almost impossible burden on the prosecution to prove the absence of unconsciousness.

27. Ordinarily, our review would be limited to plain error. *See State v. Miller*, 194 W.Va. 3, 17, 459 S.E.2d 114, 128 (1995). Under our plain error analysis, the defendant falls short of victory because the error in failing to give this instruction was not "obvious." *See State v. Marple*, 197

in fact, an insanity instruction, which was refused. Therefore we believe the claim to be adequately preserved for appeal.[28]

Second, although the trial court instructed the jury that the defendant was suffering from a brain disorder, no further instruction was given (on insanity or otherwise) which required the jury carefully to focus on how the nature of the defendant's brain disorder related to the elements of the crime. The jury should have been told that, in light of the evidence of the defendant's brain disorder and apparent blackout, he could not be convicted unless the State proved beyond a reasonable doubt that his act was *voluntary and that he acted in reckless disregard of the safety* of others.

The instructions were not wholly wanting in this regard, for the trial court did tell the jury that it could nevertheless convict the defendant, in spite of his brain disorder, if it concluded that he "knew *or should reasonably have known* of the existence of his ... condition" and he "*should reasonably have foreseen* that his condition, disease or defect would impair his ability to drive an automobile to such a degree as to endanger human life." (Emphasis added). This portion of the

instruction, however, suffers from the infirmity that it is phrased in the language of civil negligence rather than gross negligence or recklessness. Later, in the same instruction, the trial court did refer to "negligence so gross, wanton and culpable as to show a reckless disregard for human life" which "indicated a conscious indifference to the probable consequences." Nevertheless, viewing the instruction as a whole, as we must, the jury may well have been misguided with respect to the appropriate standard by which to measure the defendant's liability. An instruction more faithful to the relevant standard of voluntariness (or recklessness) would require a finding that the defendant *knew* of his condition and *knew* it could impair his ability to drive.

Third, irrespective of the foregoing, we would be inclined to reverse the defendant's conviction based on the absence of evidence justifying the "should have known" language in the charge. There is virtually no evidence in the record to indicate that the defendant knew (or reasonably should have known) of the serious nature of his brain disorder or that he knew (or reasonably should have known) that it would impair his ability to

W.Va. 176, 475 S.E.2d 176 (1996) (the error must be obvious at the time of the appeal). Nevertheless, in *Jones v. Warden, W. Va. Penitentiary*, 161 W.Va. 168, 173, 241 S.E.2d 914, 916, *cert. denied*, 439 U.S. 830, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978), this Court refused to apply strict rules of procedure where the very integrity of the judicial proceedings was implicated: "Safeguarding the integrity of the factfinding process must take priority over procedural concerns such as whether a trial lawyer could perceive future United States Supreme Court rulings and object to acts or instructions on the basis of constitutional infirmities yet unborn."

These institutional interests, moreover, do not encounter any strong countervailing concerns. Affording the defendant the benefit of the law as it now exists is compatible with the general approach that a "new rule for the conduct of criminal prosecutions is to be applied retroactively ... with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987). Indeed, the situation before us is one in which the policy concerns underlying the plain error doctrine are certainly not disturbed by evaluating the trial court's instructions under the new rule we formulated in today's opinion. Again, at the time of

trial, the instruction requested by the defendant was not unreasonable in light of our existing jurisprudence because our law did not dictate the content of the instruction. While a proposed instruction on unconsciousness and its attendant burden of proof could have afforded the trial court an opportunity to consider the specific instruction that we now require, we cannot overemphasize that there was no well-established law on this subject in this State.

28. We already have observed that presumably the proposed insanity instruction was offered to meet this Court's earlier placement of the unconsciousness defense in the insanity area. It is only today that we attempt to make clear the analytical difference. Under the aberrational circumstances, we hold the defendant can obtain a new trial if we are convinced that a jury might have found him innocent if the trial court had instructed on unconsciousness. In light of the omission to instruct as stated above and the fact that there is no evidence in the record that the defendant was aware of the possibility of a blackout, we feel the defendant is entitled to a new trial. Indeed, we, as an appellate court, cannot speculate that, given the evidence at trial, a jury properly charged would have unanimously agreed beyond a reasonable doubt as to the defendant's guilt.

drive an automobile so as to endanger human life.[29] We would be inclined to reverse for lack of sufficient evidence, which would bar retrial on double jeopardy grounds, *see Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v. Frazier,* 162 W.Va. 602, 252 S.E.2d 39 (1979), as opposed to the weight of the evidence, which does not bar retrial, *see Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), except for the fact that the State was not given an adequate opportunity to meet the defendant's unconsciousness claim as we have outlined it above.

Finally, our conclusion about the weight of the evidence is buttressed by the fact that evidence of the presence of alcohol was admitted by the trial court even though contemporaneous blood tests indicated the defendant was clearly not intoxicated, and the trial court so instructed the jury.[30] Under these circumstances, the marginal relevance of alcohol use may have been outweighed substantially by its potential to prejudice the jury, *see* W.Va.R.Evid. 401, 403, and may have obscured the jury's deliberations. On remand, the trial court should consider more carefully the balancing factors under the West Virginia Rules of Evidence and set forth its balancing of the counterfactors on the record. *See State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994); *Arnoldt v. Ashland Oil, Inc.,* 186 W.Va. 394, 412 S.E.2d 795 (1991).

### III.

### CONCLUSION

Based on the foregoing, the judgment of the Circuit Court of Pleasants County is reversed, and this case is remanded for a new trial.

Reversed and Remanded.

---

29. The defendant had suffered from other symptoms such as dizziness and blurred vision, but he had not previously experienced a blackout.

30. The trial court instructed the jury that the defendant "was not under the influence of alcohol at the time of the accident." This Court initially refused to hear this assignment of error on appeal. Our present review of the record indicates this assignment may have substantial merit.