NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter.  Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

WILLIAM E. PALMER,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-10972
Trial Court No. 3PA-09-2277 CR

O P I N I O N

No. 2507 — July 1, 2016

Appeal from the Superior Court, Third Judicial District, Palmer, Vanessa White, Judge.

Appearances: Zachary K. Brown, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.  Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

Judge ALLARD, writing for the Court.
Judge MANNHEIMER, concurring.
Judge COATS, concurring.

---

[*]    Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

William E. Palmer was convicted of seven counts of third-degree assault after an armed stand-off with state troopers that occurred at his home near Sutton. Shortly after Palmer was taken into custody, it was discovered that he was suffering from a ruptured brain aneurysm. Palmer received emergency surgery to repair the aneurysm and was later found legally incompetent to stand trial. A few weeks later, Palmer had recovered sufficiently from both the ruptured aneurysm and the surgery to be found legally competent, although he continued to have no memory of the incident that led to his arrest.

Prior to trial, the State filed a motion in limine requesting that the superior court preclude any mention of Palmer's brain aneurysm at trial unless Palmer complied with the procedural requirements that apply to defendants raising an insanity defense or raising a claim of diminished capacity based on "mental disease or defect."[1] These requirements include written pretrial notice and submission to two court-ordered psychiatric or psychological examinations.[2]

In response, Palmer's attorney acknowledged that he intended to present evidence that Palmer was suffering from a brain aneurysm at the time of his stand-off with the troopers. But the defense attorney asserted that he was not raising a mental disease or defect defense. Instead, he intended to offer evidence of Palmer's temporary and acute physical ailment to support an "involuntariness" defense.[3] That is, he intended to argue that there was reasonable doubt as to whether Palmer's actions during the stand-off with the troopers qualified as "voluntary," given the effects of his ruptured brain aneurysm.

---

[1]  *See* AS 12.47.010(a); AS 12.47.020(a).

[2]  *See* AS 12.47.010(a); AS 12.47.020(a); AS 12.47.070(a).

[3]  *See* AS 11.81.600(a).

The defense attorney argued that because he was not raising a mental disease or defect mens rea defense, AS 12.47.070(a) did not apply and nothing useful would be gained by court-ordered psychiatric examinations. Instead, the attorney asserted that he had other medical experts that he intended to call at trial to support his involuntariness defense.

The superior court ultimately ruled — without hearing Palmer's proposed expert testimony — that Palmer "was, in fact, attempting to present the jury with a defense based upon mental defect." The court therefore concluded that Palmer was required to submit to two court-ordered psychiatric examinations as a precondition to raising his defense. The court warned Palmer's attorney that if Palmer did not submit to these psychiatric examinations, the court would grant the State's motion in limine and preclude him from introducing any evidence of the brain aneurysm at trial.

Rather than undergo the psychiatric examinations ordered by the court, Palmer's attorney withdrew the proposed involuntariness defense. The superior court then granted the State's motion in limine and the case went to trial.

At trial, the jury did not hear any evidence of Palmer's ruptured brain aneurysm, and the State was permitted to present evidence that the troopers thought Palmer's slurred speech and unsteady gait were symptoms of intoxication.

The jury convicted Palmer of seven counts of third-degree assault. At sentencing, the court found that Palmer had been suffering from a "mental defect" during the incident (that is, a "mental defect" caused by the rupturing of his brain aneurysm), and that Palmer was "not himself" at the time of the incident.

Palmer now appeals, arguing that the trial court erred when it ordered him to submit to psychiatric examinations as a precondition to asserting an involuntariness defense based on his ruptured brain aneurysm. Palmer contends that the trial court's

ruling unfairly forced him to choose between his constitutional right to remain silent and his due process right to present his defense.

For the reasons explained in this opinion, we conclude that the court acted prematurely when it ordered Palmer to waive his constitutional rights and submit to unwanted psychiatric examinations before the court had a clear understanding of the legal and factual contours of Palmer's proposed involuntariness defense.  Accordingly, we remand this case to the superior court to give Palmer an opportunity to make a full offer of proof describing his proposed involuntary defense and the evidence he intends to offer in support of it, including any (non-psychiatric) expert evidence. If Palmer's offer of proof is sufficient to raise a legitimate claim of involuntariness, the trial court shall then permit reconsideration of its original ruling and determine whether Palmer is otherwise entitled to a new trial in which evidence of his ruptured brain aneurysm is provided to the jury.

In a separate claim of error on appeal, Palmer argues that the superior court erred by refusing to instruct the jury on the lesser offense of second-degree harassment. We find no merit to this claim, and we therefore affirm the superior court's decision on this issue.

*Underlying facts and proceedings*

In 2009, William E. Palmer and his girlfriend Kay Anderson were living outside of Sutton.  Palmer was 62 years old at the time.  Around the beginning of September, Palmer began to act strangely:  he seemed disoriented, he was unable to maintain his balance, and his behavior became erratic.  Because of this strange behavior, a neighbor tried to hide Palmer's guns.

On September 5, 2009, when Palmer was unable to find some of his guns, he called 911 to report that the guns had been stolen.  Palmer then gave the phone to

Anderson, who stated that Palmer had been firing a gun outside the residence, and that she was frightened for her life. Based on this call, six state troopers responded to Palmer's residence.

When the troopers arrived, Palmer walked out of his house holding what appeared to be an AK-47 rifle. The troopers told Palmer to drop the rifle, but he initially refused to do so, asserting that he had a constitutional right to carry the firearm. Palmer then swung the rifle in the direction of the troopers, putting it down on the ground.

Although Palmer put the rifle down, he was still carrying a .44 revolver in a "cowboy-style" holster on his hip, and he was wearing a shoulder holster that appeared to contain another handgun. When Palmer reached down as though he might draw the .44 revolver, Trooper Joshua Varys lunged at Palmer, grabbed the revolver, and put Palmer "in a bear hug." Trooper Varys later testified that he believed he saved Palmer's life by using a lesser degree of force than would have been justified under the circumstances. Several of the other troopers testified that they, too, believed that Palmer was going to shoot them and that they would have been justified in using lethal force against him.

Palmer was arrested and charged with seven counts of third-degree assault for recklessly placing the six troopers and his girlfriend, Anderson, in fear of imminent serious physical injury by means of a dangerous instrument.[4] Palmer was also charged with two counts of fourth-degree misconduct involving a weapon for possessing the firearms while he was intoxicated.[5]

After his arrest, Palmer continued to behave erratically. At his arraignment that same day, the arraigning judge expressed concern that Palmer was not mentally

---

[4] AS 11.41.220(a)(1)(A).

[5] AS 11.61.210(a)(1).

competent to stand trial, and she ordered a competency evaluation. Shortly thereafter, while Palmer was still at the jail following his arraignment, his behavior continued to deteriorate: he "defecat[ed] on the dorm eating tables," he "smear[ed] feces across the tables and benches," and he "exhibited confused speech" and an "unsteady gait."

Because of this, Palmer was transferred to Alaska Regional Hospital, where an MRI revealed that he had a brain hemorrhage caused by a ruptured brain aneurysm. Palmer had immediate surgery to repair the ruptured aneurysm. After the surgery, Palmer remained severely mentally impaired — his speech was incomprehensible, he lacked short-term memory, he was agitated and violent, and he was "oriented to name only." Palmer was kept in four-point restraints at the hospital and remained in restraints after his transfer back to the medical segregation unit at the Anchorage jail.

Dr. Lois Michaud, a psychologist at the Alaska Psychiatric Institute, evaluated Palmer at the jail to determine if he was competent to stand trial. Dr. Michaud found that Palmer's cognitive status "present[ed] a significant barrier to being found competent by the Court." Dr. Michaud noted that Palmer's "presentation was that of a confused individual who appeared disoriented."

Three weeks later, Dr. Michaud evaluated Palmer again. During this second evaluation, Palmer's recall of the incident involving the troopers continued to be "jumbled," but he was otherwise "oriented and alert." Dr. Michaud concluded that Palmer's confused memory of the incident was a result of "the stroke and seizure he suffered at the time of the alleged events." Dr. Michaud also reported that Palmer had been diagnosed with dementia secondary to a cardiovascular incident, but that his dementia was "now resolved." Upon receiving Dr. Michaud's second evaluation, the superior court found Palmer competent to stand trial.

Prior to trial, the State filed a motion in limine asking the court to bar Palmer from offering any evidence of his brain aneurysm, or any evidence of Dr.

Michaud's two competency evaluations, because Palmer had not provided the State with written notice of a "mental disease or defect" defense, as required by Alaska law.[6] The State also argued that Palmer should be required to submit to court-ordered psychiatric examinations under AS 12.47.070(a) before any evidence of a "mental disease or defect" could be introduced.

(Under AS 12.47.070(a), if a defendant gives notice of an intent to rely on a defense of insanity or diminished capacity, or if "there is reason to believe that a mental disease or defect of the defendant will otherwise become an issue in the case," the court is required to appoint at least two qualified psychiatrists or forensic psychologists to examine and report upon the mental condition of the defendant.[7])

Palmer's attorney responded that he was not raising a diminished capacity defense based on "mental disease or defect" nor was he otherwise challenging the State's proof on the culpable mental state. Instead, he intended to raise an involuntariness defense based on the physical and temporary effects of Palmer's ruptured brain aneurysm. That is, he intended to argue to the jury that there was a reasonable doubt as to the "voluntariness" of Palmer's actions at the time of the stand-off given the effects of the ruptured brain aneurysm.

---

[6] *See* AS 12.47.010(b); AS 12.47.020(a) (precluding evidence of insanity, or evidence of a mental disease or defect that tends to negate a culpable mental state, "unless the defendant, within 10 days of entering a plea, or at such later time as the court may for good cause permit, files a written notice of intent to rely on that defense"); *see also* Alaska R. Crim. P. 16(c)(5) (same).

[7] This statute is primarily derived from the Model Penal Code and pre-dates the 1982 legislative revisions to Title 12. *See* American Law Institute, *Model Penal Code and Commentaries* (Official Draft, 1962, and Revised Comments, 1985), Part I, General Provisions (§ 4.05 cmt.), p. 234-236.

The defense attorney analogized Palmer's situation to a person who has a heart attack while driving and loses control of the car. The only difference, he argued, was that Palmer's physical ailment "just happened to be in his brain."

The defense attorney also argued that Palmer should not be forced to submit to court-ordered psychiatric examinations and to face a potential verdict of "guilty but mentally ill" when he was not otherwise raising a mental disease or defect defense under Alaska law.

Lastly, the defense attorney questioned the usefulness of a psychiatric examination in this case, given that Palmer's ruptured brain aneurysm was a temporary and acute medical condition that had been "surgically fixed" nine months earlier. Instead, he argued that he would call his own (unidentified) medical experts to explain his proposed involuntariness to the court, and ultimately to the jury.

The court concluded that it needed the mental health examinations in order to understand Palmer's proposed defense:

> *The Court*: I'm going to need to hear from the [court-appointed] experts whether there was a physical problem in Mr. Palmer's brain that caused him to behave involuntarily. ... And I will make the decision after hearing from those experts and from the defendant's experts, if any, as to whether or not this falls within the four corners of a "mental disease or defect" defense or whether it constitutes some other kind of defense more related to the actus reus elements of the offenses.

In a later written order, the court stated that it ordered the mental health examinations under AS 12.47.070(a) because it agreed with the prosecutor that, despite the defense attorney's protestations, the defense attorney "was, in fact, attempting to present the jury with a defense based upon mental defect."

The court also stated that it had decided to appoint psychiatrists rather than psychologists to perform the evaluations under AS 12.47.070(a) because of the "physical nature" of the "mental disease or defect" alleged by the defendant, and because the court believed that "[p]sychiatrists, as medical doctors, are better qualified to determine whether this defendant's brain aneur[y]sm afflicted him on the day of his arrest," and whether the brain aneurysm "resulted in a diminished mental capacity that made it impossible for [the] defendant to engage in volitional acts of assault."

Rather than have Palmer undergo the court-ordered psychiatric examinations, Palmer's attorney withdrew the proposed involuntariness defense, citing the attorney's concerns about the potential consequences of raising a "mental disease or defect" defense under Alaska law, including the possible consequence of a "guilty but mentally ill verdict."

The court granted the State's original motion in limine and prohibited the defense attorney from introducing any evidence of Palmer's ruptured brain aneurysm at trial.

At trial, Palmer's defense to the assault charges was limited to his claim that the State had not proven beyond a reasonable doubt that the troopers had been in fear of imminent serious physical injury, given their professional training as law enforcement officers. The jury did not hear any evidence about Palmer's ruptured brain aneurysm and none of the witnesses were permitted to mention the brain aneurysm.

However, during trial, the troopers were permitted to testify that Palmer's slurred speech, impaired balance, and blank unfocused stare made them think that Palmer was intoxicated. After the prosecutor presented this testimony, Palmer's attorney argued that the prosecutor had opened the door to evidence of the brain aneurysm to explain why Palmer was acting in a way that might lead the troopers to think he was intoxicated.

The court did not allow the defense attorney to present this rebuttal evidence, declaring that Palmer had passed up "the golden opportunity" to introduce this evidence when he refused to submit to the psychiatric examinations ordered by the court.

The jury subsequently convicted Palmer of the seven counts of third-degree assault (against the six troopers and his girlfriend). The jury acquitted Palmer of the weapons misconduct charges (for possessing firearms while intoxicated).

At sentencing, the superior court heard additional testimony from Palmer's girlfriend about Palmer's symptoms before and during the incident. Based on this testimony, the court found that Palmer was suffering from a "mental defect" — that is, the ruptured brain aneurysm — at the time of the incident with the troopers. The court also found that Palmer had established the statutory mitigator AS 12.55.155(d)(5) — that his conduct "was substantially a product of physical or mental infirmities resulting from the defendant's age" — based on the brain aneurysm.

In its sentencing remarks, the court stated: "[I] have no doubt, from the record before me, that Mr. Palmer experienced a profound event ... — the physical insult to his brain caused by the aneurysm that changed his behavior ... . Mr. Palmer was not himself on the night of the incident, and ... his actions were beyond his control because of this aneurysm."

The court ultimately sentenced Palmer to a composite term of 7 years with 6 years suspended (1 year to serve).

This appeal followed.

*Why we conclude that the superior court erred in ordering Palmer to submit to psychiatric examinations under AS 12.47.070(a) without first giving Palmer's attorney an opportunity to support his proposed involuntariness defense with an appropriate offer of proof*

On appeal, Palmer argues that the superior court erred when it ordered him to submit to psychiatric examinations as a precondition to raising his proposed involuntariness defense. Palmer contends that because he was not raising a statutory mental disease or defect defense under Title 12, the procedural requirements under AS 12.47.070(a) did not apply to him. Palmer also argues that the superior court's ruling unfairly forced him to choose between his constitutional right to remain silent and his due process right to present his defense.

In response, the State argues that none of Palmer's arguments are properly before this Court because Palmer voluntarily withdrew his proposed defense prior to undergoing any of the court-ordered psychiatric examinations. The State is correct that, ordinarily, a defendant's withdrawal of his proposed defense would result in waiver of any appellate claim based on that defense.[8] But, as previously explained, we conclude that application of that rule in this case would be unjust given the unique facts and circumstances of this case.

In the superior court, Palmer disclaimed any intent to rely on a defense of mental disease or defect. Instead, he asserted that he intended only to raise a defense of involuntariness based on the effects of the ruptured brain aneurysm. That is, he intended to argue to the jury that, based on the effects of this "acute and temporary physical ailment," there was reasonable doubt as to the voluntariness of his actions during the stand-off with the troopers.

---

[8]  *See, e.g., Sam v. State*, 842 P.2d 596, 598-99 (Alaska App. 1992) (holding that defendant's abandonment of his diminished capacity defense precludes review of trial court's evidentiary ruling).

The prosecutor nevertheless argued (and the superior court essentially agreed) that Palmer's proposed defense was indistinguishable from a claim of diminished capacity based on mental disease or defect under AS 12.47.020. We disagree.

As Palmer correctly points out, there are important distinctions between the defense of diminished capacity under AS 12.47.020(a) and the proposed involuntariness defense that Palmer sought to raise. There are also important distinctions between the post-verdict dispositions of defendants who successfully raise these two defenses.

The defense of diminished capacity under Alaska law is a failure-of-proof defense — that is, a defense grounded in the constitutional requirement that the State prove all elements of a crime beyond a reasonable doubt. Thus, unlike the affirmative defense of insanity, a defendant bears no burden of proof with regard to a claim of diminished capacity.

Instead, under Alaska Statute 12.47.020(a), "evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a culpable mental state which is an element of the crime." However, the statute also provided that "evidence of mental disease or defect that tends to negate a culpable mental state" is *not* admissible unless the defendant complies with the procedural requirements required to raise this defense — namely, written notice of intent to rely on the defense and submission to the court-ordered psychiatric/psychological examinations under AS 12.47.070(a).

In addition, a defendant who prevails on a claim of diminished capacity is not necessarily relieved of criminal responsibility or released from state custody. AS 12.47.020(b) provides that "when the trier of fact finds that all elements of the crime are proved but that, as a result of a mental disease or defect, there is a reasonable doubt

as to the existence of a culpable mental state," a verdict of "not guilty by reason of insanity" rather than "not guilty" is entered.[9]

The trier of fact is then required to determine whether the defendant is guilty of any lesser included offenses. If the defendant is found guilty of a lesser included offense, a verdict of "not guilty but mentally ill" is entered on the lesser included offense.[10] A defendant who is found "guilty but mentally ill" under Alaska law is not relieved of criminal responsibility. Instead there are two primary consequences to this verdict: (1) the Department of Corrections is required to provide mental health treatment to the defendant during his incarceration; and (2) the defendant is ineligible for parole or furlough while the need for treatment continues.[11]

Upon completion of the sentence for the lesser included offense (or if the defendant is not found guilty of any lesser included offense) the defendant then faces the consequences of having been found "not guilty by reason of insanity" of the original offense.[12]

Under AS 12.47.090, a defendant who is "not guilty by reason of insanity" is not released from custody. Instead, the defendant is automatically subject to further commitment in the state's custody and is presumed to be dangerous to the public and in need of long-term psychiatric care.[13] The defendant can rebut this presumption by

---

[9] AS 12.47.020(b); *but see Barrett v. State*, 772 P.2d 559, 575-76 (Alaska App. 1989) (Bryner, J., concurring) (expressing "serious reservations" about the constitutionality of a verdict of "not guilty by reason of insanity" under AS 12.47.020(b)).

[10] AS 12.47.020(c).

[11] *See* AS 12.47.050; *see also State v. Clifton*, 315 P.3d 694, 699 (Alaska App. 2013) (describing the consequences of a "guilty but mentally ill" verdict).

[12] *See* AS 12.47.020(b); AS 12.47.090.

[13] *See* AS 12.47.090.

proving, by clear and convincing evidence, that he is "not presently suffering from any mental illness that causes the defendant to be dangerous to the public."[14]

But this burden is intended to be a high one. The term "mental illness" in this context is intended to be  "substantially broade[r]" than the Title 12 definition of "mental disease or defect" and is defined as "*any* mental condition that increases the propensity of the defendant to be dangerous to the public peace or safety"[15]

If the defendant fails to prove his burden that he is free from "any mental illness," the defendant is automatically committed to the custody of the department of health and social services and will remain under state custody (typically in a secure psychiatric facility) until such time as the defendant can meet the burden of proving by clear and convincing that "the mental illness is cured or corrected" or until the maximum term of imprisonment that would have applied if the defendant had been found guilty otherwise expires.[16]

---

[14]   AS 12.47.090(c); *see also* AS 12.47.090(a) (providing for immediate post-verdict hearing in front of same trier of fact if prior notice was properly provided); AS 12.47.090(b) (providing for automatic commitment to commissioner of health and social services if defendant did not provide prior notice); AS 12.47.090(e) (providing for periodic court review to determine whether defendant can meet burden of proving that commitment is no longer necessary).

[15]   AS 12.47.090(k)(2) (emphasis added); *See also* House Journal Supp. No. 64, at 13-14 (June 2, 1982) (emphasizing that definition of mental illness substantially broadens definition of "mental disease or defect" and is intended to ensure that "not guilty by reason of insanity" defendant is "free of any mental condition that bears upon the issue of his dangerousness" before release from state custody can be ordered by the court); *contrast*  House Journal Supp. No. 64, at 7-8 (June 2, 1982) (emphasizing narrowness of statutory definition of "mental disease or defect").

[16]   *See* AS 12.47.090(d).

Like the defense of diminished capacity, the defense of involuntariness is a failure-of-proof defense that is grounded in the constitutional requirement that the State prove all elements of a crime beyond a reasonable doubt. But unlike the defense of diminished capacity, a defendant raising a claim of involuntariness seeks to challenge the State's proof of the *actus reus* of the crime, rather than the defendant's mental state. That is, the defendant intends to argue that there is reasonable doubt as to the *voluntariness* of his acts (as that term is defined under criminal law).

The defense of involuntariness is well-established under Alaska law. Alaska Statute 11.81.600(a) declares that the minimal requirement for criminal liability under Alaska law is the performance of a voluntary act or omission.[17] Our caselaw likewise recognizes that, although rarely disputed, the performance of a voluntary act "remains an implicit element of all crimes" for which the State bears the burden of proof beyond a reasonable doubt.[18]

Thus, when a defendant produces evidence sufficient to raise a reasonable doubt that his actions were voluntary, the defendant is entitled to a jury instruction on this defense, and the State must prove the element of voluntariness beyond a reasonable doubt.[19]

As a general matter, an act is considered "involuntary" for purposes of the criminal law if it is the result of reflexive or convulsive movements, or movements

---

[17]  *See* AS 11.81.600(a).

[18]  *State v. Simpson*, 53 P.3d 165, 169 (Alaska App. 2002); *see also Mooney v. State*, 105 P.3d 149, 155 (Alaska App. 2005); *Kuchnicki v. State*, 604 P.2d 1099, 1103-04 (Alaska 1979) (Singleton, J., concurring) (recognizing defense of automatism under Alaska law and characterizing it as excluding criminal responsibility where a defendant acts during convulsions, sleep, unconsciousness, hypnosis, or seizures).

[19]  *Id.*

during sleep, unconsciousness, or hypnosis.[20] Also known as "automatism," the concept of involuntariness "connot[es] the state of a person who, though capable of action, is not conscious of what he is doing."[21]

Courts in other jurisdictions have recognized that involuntariness can arise in a wide variety of conditions, including "epileptic and post-epileptic states, clouded states of consciousness associated with organic brain disease, [and] concussional states following head injuries[.]"[22]

The Alaska courts have yet to address the variety of conditions that can lead to a claim of involuntariness. Nor do we believe that it is prudent to do so in this case given the deficiencies of the record before us on appeal.

We note that, although there appears to be little dispute that Palmer suffered a ruptured brain aneurysm around the time of the stand-off with the troopers, the effects of the brain aneurysm on the *voluntariness* of his actions is not immediately obvious. The record suggests that Palmer was actively engaged with the troopers during the stand-off and that he made various statements about his "constitutional rights." These facts are not necessarily inconsistent with a claim of involuntariness, but they require further explanation of Palmer's brain aneurysm than has been provided so far.

---

[20]  *See, e.g.*, *Simpson*, 53 P.3d at 169; *Mooney*, 105 P.3d at 155.

[21]  2 Wayne R. LaFave, *Substantive Criminal Law* § 9.4(a), at 33 (2d ed. 2003) (quoting F. Whitlock, *Criminal Responsibility and Mental Illness*, at 119-20 (1963)).

[22]  *Id.*; *see also People v. Garcia*, 113 P.3d 775, 782-83 (Co. 2005) (involuntariness based on hypoglycemia); *Reed v. State*, 693 N.E.2d 988, 989-992 (Ind. App. 1998) (involuntariness based on transient ischemic attack/stroke); *State v. Hinkle*, 489 S.E.2d 257, 263-264 (W. Va. 1996) (involuntariness based on undiagnosed brain disorder); *Fulcher v. State*, 633 P.2d 142, 144-47 (Wyo. 1981) (involuntariness based on concussion).

In the superior court, Palmer's defense attorney asserted that he had additional evidence and (presumably non-psychiatric)[23] medical experts that he intended to call to support the proposed involuntariness defense. We therefore remand this case to the superior court to give Palmer an opportunity to present this additional evidence and to argue that there is sufficient evidence of his proposed defense to raise a reasonable doubt as to the voluntariness of his actions during the stand-off with the troopers.

If the superior court concludes that Palmer's offer of proof on remand is sufficient to raise his proposed involuntariness defense, the parties should then be allowed to litigate whether the psychiatric examinations required under AS 12.47.070(a) otherwise apply to this case. Because this question is not yet ripe in Palmer's case, we do not resolve it here. However, we note that, although some courts continue to view involuntariness as a subset of a mental disease or defect/insanity defense, most courts and commentators appear to agree that "the better rationale" is to view the two defenses as legally distinct.[24]

---

[23] As the United States Supreme Court recently re-affirmed in *Kansas v. Cheever*, 134 S.Ct. 596 (2013), a defendant may not introduce expert testimony that is based on interviews with the defendant without opening the door to claims that he has thereby waived his Fifth Amendment rights. *Id.* at 603 ("Any other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime."); *see also Buchanan v. Kentucky*, 483 U.S. 402, 422-23 (1987).

[24] *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.4, at 32-41 (2d ed. 2003); *see also People v. Garcia*, 113 P.3d 775, 782-83 (Co. 2005); *Smith v. State*, 663 S.E.2d 155, 156-157 (Ga. 2008); *McClain v. State*, 678 N.E. 2d 104, 108-09 (Ind. 1997); *Mendenhall v. State*, 77 S.W.3d 815, 818 (Tex. Crim. App. 2002)*; State v. Hinkle*, 489 S.E.2d 257, 263-264 (W. Va. 1996); *Fulcher v. State*, 633 P.2d 142, 144-47 (Wyo. 1981); *cf. Paradiso v. State*, 2012 WL 880624, at *2 (Alaska App. Mar. 14, 2012) (unpublished) (Bolger, J., concurring) (noting that defendant who is otherwise statutorily restricted from raising diminished capacity could potentially raise an involuntary defense under same facts).

*Why we conclude that the superior court properly rejected Palmer's request to instruct the jury on the lesser included offense of harassment*

As a separate point on appeal, Palmer argues that the superior court erred by refusing to instruct the jury on second-degree harassment as a lesser included offense of third-degree assault. We find no merit to this claim.

At trial, Palmer asked the superior court to instruct the jury on the offense of second-degree harassment as a lesser included offense to the charge of third-degree assault against Trooper Varys. A person commits the crime of second-degree harassment if "with intent to harass or annoy another person, that person ... insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response."[25] Palmer argued that the jury could convict him of harassment based on the "challenge" implicit in his initial refusal to put the AK-47 rifle down in response to Trooper Varys's order.

Under Alaska's cognate approach to lesser included offenses, a defendant is entitled to a lesser included instruction if, based on the evidence presented at trial, it would be impossible for the defendant to commit the greater offense without also committing the lesser offense, and "if there is some evidence which could lead a reasonable jury to find that the element which distinguishes the greater offense from the lesser has not been proved."[26] Here, the jury could have convicted Palmer of third-degree assault without convicting him of second-degree harassment and Palmer presented no evidence that he intended to harass or annoy Trooper Varys.

To show that Palmer had the reckless mental state required to convict him of third-degree assault, the State relied on evidence that Palmer pointed a rifle in the

---

[25]  AS 11.61.120(a)(1).

[26]  *Wilson v. State*, 670 P.2d 1149, 1151 (Alaska App.1983).

direction of the troopers and reached toward a second gun, declaring that he was acting within his constitutional rights. From this evidence, the jury could have found that Palmer acted in reckless disregard of the risk that his actions placed the trooper in fear of imminent serious physical injury without finding that Palmer did so with the intent to harass or annoy the trooper. Therefore, the trial court did not err in refusing to instruct the jury on this lesser offense.

*Conclusion*

We REMAND this case to the superior court for further proceedings consistent with this opinion. Within 120 days (a deadline that can be extended for good cause), the superior court shall notify this Court of the outcome of the remand proceedings. We retain jurisdiction of this case.

Judge MANNHEIMER, concurring.

This case involves an unusual circumstance: the defendant, William E. Palmer, was charged with several counts of assault, and he wished to defend these charges by asserting that his assaultive behavior was the result of a ruptured aneurysm in his brain.

The issues presented in this appeal stem primarily from profound disagreements between the attorneys and the trial judge as to (1) how to categorize this defense legally, and (2) how the defense should be litigated procedurally.

Palmer's attorney claimed that the ruptured aneurysm and the resulting hemorrhage within Palmer's brain deprived Palmer of his capacity to act "voluntarily" (as that term is used in the criminal law). This claim has factual components — for instance, whether Palmer's assault on the troopers was inconsistent with his "baseline" behavior (*i.e.*, his pre-aneurysm behavior), and whether Palmer's aneurysm ruptured before Palmer threatened the troopers with the firearm or, instead, immediately afterwards, while the troopers were struggling with Palmer to physically subdue him.

The answers to these questions are not self-evident, and they potentially involve either neurological expertise, or psychological expertise, or both. For this reason, the superior court could properly require Palmer's attorney to support his proposed defense with expert testimony — and require him to reveal this anticipated expert testimony to the State before trial.

But as Judge Allard's lead opinion explains, the expert analysis that would be needed to answer these questions is not necessarily the kind of analysis that would be derived from the psychiatric examinations authorized by AS 12.47.070. Palmer's attorney in fact contended that he could reasonably base his proposed defense on other types of expertise. The superior court should have given the defense attorney the

opportunity to show that this was true before the court ordered Palmer to undergo psychiatric evaluation under AS 12.47.070.

Palmer's proposed defense also raised legal questions. Most importantly, Palmer asserted that if his assaultive behavior was indeed the result of behavioral changes caused by his ruptured aneurysm, then his actions were not "voluntary" for purposes of the criminal law.

The law does not punish people for involuntary acts or omissions. As stated in AS 11.81.600(a), "The minimal requirement for criminal liability is ... a voluntary act or the omission to perform an act that the person is capable of performing." For purposes of imposing criminal liability, the law does not view an involuntary action as an "act". [1] Thus, if a defendant's actions were "involuntary" (within this specialized sense), the government will have failed to prove the "*actus reus*" of the charged crime.

There is general agreement that bodily movements resulting from reflex or convulsion are not "voluntary". [2] There is also general agreement that bodily movements performed during unconsciousness or sleep are not "voluntary". [3] But a person's conscious bodily movements remain "voluntary" even when, due to mental illness, the person feels an "irresistible impulse" to engage in that conduct. [4]

As Judge Allard's lead opinion notes, some courts have held that when a person's consciousness is altered by an acute brain injury, the person is entitled to argue that their ensuing conduct was not "voluntary". But the question of whether a person's

---

[1] Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 837; Wayne R. LaFave, *Substantive Criminal Law* (2nd ed. 2003), § 6.1(c), Vol. 1, pp. 425-29.

[2] *LaFave*, § 6.1(c), Vol. 1, pp. 426-27, 429.

[3] *Id.* at 426-27.

[4] *See id.* at 428-29.

actions should be deemed "voluntary" or "involuntary" for purposes of the criminal law is ultimately not a medical question. It is, instead, a question of social policy: Under what circumstances are we going to hold people criminally accountable for their actions? As the United States Supreme Court noted in *Powell v. Texas*, "[t]he doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress" are all tools that our society employs to make "a constantly shifting adjustment ... between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man." [5]

When a person's perceptions and behavior are substantially affected by a brain hemorrhage or other brain trauma, some might reasonably analogize the situation to sleepwalking or "automatism" — thus reaching the conclusion that if the person engages in assaultive conduct, that conduct should be deemed "involuntary" for purposes of the criminal law.

But other people might reasonably conclude that the brain hemorrhage has not affected the "voluntariness" of the person's actions — that, instead, the hemorrhage has skewed the person's perception of danger, or has weakened the person's normal ability to subdue their aggressive impulses. Under this view, the person's actions might plausibly be deemed "voluntary" because those actions would remain the product of conscious will.

Because Palmer declined to pursue his "involuntariness" claim, this legal question has not been litigated, and I wish to emphasize that this Court's opinion does not resolve this question.

---

[5]    392 U.S. 514, 536; 88 S.Ct. 2145, 2156; 20 L.Ed.2d 1254 (1968).

Judge COATS, concurring.

At Palmer's sentencing, the superior court stated: "[I] have no doubt, from the record before me, that Mr. Palmer experienced a profound event ... — the physical insult to his brain caused by the aneurysm that changed his behavior ... . Mr. Palmer was not himself on the night of the incident, and … his actions were beyond his control because of this aneurysm." Based on this finding by the superior court, it appears to me that Palmer in all probability had a colorable defense to the crimes with which he was charged — a defense that he was never allowed to present during his trial.

We have remanded this case to allow Palmer an opportunity to present non-psychiatric medical expert testimony in support of his proposed involuntariness defense. I would expand this remand to allow the expert testimony to also address whether the effects of Palmer's aneurysm might cast doubt on whether Palmer had the required mental state to commit the offenses.

I also write separately to clarify that nothing in the majority's decision prevents Palmer from also presenting lay witness testimony on his behavior leading up to and during the crime to support his defense. At sentencing, the court heard testimony from Palmer's girlfriend about Palmer's symptoms before and during the incident — testimony the sentencing court apparently found useful and convincing.